61 F.3d 1529
 UNITED STATES of America, Plaintiff-Appellant,
v.
Clara Inez TOVAR-RICO, Defendant-Appellee.
UNITED STATES of America, Plaintiff-Appellant,
v.
Clara Inez TOVAR-RICO, Luis Alberto Figueroa-Marmolejo,
Isabel Romeo, Defendants-Appellees.
UNITED STATES of America, Plaintiff-Appellant,
v.
Isabel ROMEO, Defendant-Appellee.
 Nos. 91-5212, 91-5759 and 93-4163.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 28, 1995.
 
 William R. Miller, Sp. Asst. U.S. Atty., Linda Collins Hertz, Anne R. Schultz, Asst. U.S. Attys., Miami, FL, for appellant in No. 91-5212.
 Scott T. Kalisch, Kalisch & Lyons, Coral Gables, FL, for appellee in No. 91-5212.
 Dexter W. Lehtinen, U.S. Atty., Anne Ruth Schultz, Linda Collins Hertz, Miami, FL, Asst. U.S. Attys., Miami, FL, for appellant in No. 91-5759.
 Scott T. Kalisch, Kalisch & Lyons, Coral Gables, FL, for Tovar-Rico, in No. 91-5759.
 Roy J. Kahn, Miami, FL, for Figueroa-Marmolejo.
 John W. Thornton, Thornton, Rothman & Emas, P.A., Miami, FL, for Romeo.
 Roberto Martinez, U.S. Atty., Anne R. Schultz, Asst. U.S. Atty., Miami, FL, for appellant in No. 93-4163.
 John W. Thornton, Jr., Thornton, Rothman & Emas, P.A., Miami, FL, for appellee in No. 93-4163.
 Appeals from the United States District Court for the Southern District of Florida.
 Before EDMONDSON and BARKETT, Circuit Judges, and DYER, Senior Circuit Judge.
 DYER, Senior Circuit Judge:
 
 
 1
 The United States appeals the judgments of acquittal of Tovar-Rico (Tovar) and Isabel Romeo (Romeo), and the sealed verdict of Luis Figueroa Marmolejo (Figueroa) who is a fugitive, all of whom were charged with conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C. Sec. 846 (Count 1) and possession of cocaine with intent to distribute in violation of 21 U.S.C. Sec. 841(a)(1) (Count 2). Codefendant Johnny Lozano entered a plea of guilty as to both counts. We reverse the judgment of acquittal of Tovar, affirm the judgment of acquittal of Romeo, and dismiss the government's appeal of Figueroa.
 
 PROCEDURAL HISTORY
 
 2
 After Tovar was indicted, she filed a motion to suppress evidence seized in a warrantless search of apartment unit 901. The district court granted Tovar's motion. The government filed a timely notice of appeal and a certificate that the evidence suppressed was material and that the government's appeal was not for the purpose of delay.
 
 
 3
 The government requested that Tovar's trial be severed from the trial of her codefendants' which was denied ore tenus. The government filed a motion for reconsideration which was likewise denied. The government moved to stay the trial as to all of the defendants pending resolution of the suppression appeal. The district court refused to stay the proceedings and the defendants proceeded to trial. At the end of the government's case in chief, the district court granted a judgment of acquittal as to Tovar. Romeo was found not guilty as to Count 2 and the jury was unable to reach a verdict as to Count 1. Figueroa's verdict was sealed because he had fled the jurisdiction prior to trial. The government filed a notice of appeal of the judgments of acquittal and verdicts.
 
 
 4
 The government moved to stay the retrial of Romeo on Count 1 pending the resolution of the pending government appeal. The district court denied the motion. Romeo proceeded to trial, and again the jury was unable to reach a verdict. Romeo filed a post-trial motion for judgment of acquittal which the district court granted. The government appealed.
 
 STATEMENT OF THE CASE
 
 5
 In Part 1, we consider whether the government's appeal of the district court's order granting Tovar's motion to suppress evidence divested the district court of jurisdiction to try Tovar while the appeal was pending.
 
 
 6
 In Part 2, we consider whether exigent circumstances existed which would authorize the agents' entry and search of apartment unit 901 and whether Tovar voluntarily consented to the search.
 
 
 7
 In Part 3, we consider whether the government's appeal of the district court's order granting Tovar's motion to suppress evidence divested the district court of jurisdiction (a) to try Romeo on Count 2 and its judgment of acquittal as to Count 1 and (b) to try Figueroa on both counts of the indictment.
 
 
 8
 In Part 4, we consider whether we have jurisdiction to entertain the government's appeal as to Figueroa.
 
 DISCUSSION
 Part 1
 
 9
 Whether the district court had jurisdiction to try Tovar while the suppression order was pending on appeal is a question of law subject to plenary review. See Mars v. Mounts, 895 F.2d 1348, 1351 (11th Cir.1990).
 
 
 10
 Pursuant to 18 U.S.C. Sec. 3731, the government filed a timely notice of appeal of the district court's order suppressing the evidence found by the warrantless search of unit 901. In the usual case, with limited exceptions not present here, the filing of a notice of appeal divests the district court of jurisdiction over the aspects of the case involved in the appeal. "[A] federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously. The filing of a notice of appeal is an event of jurisdictional significance--it confers jurisdiction on the court of appeals and divests the district court of its control over the aspects of the case involved in the appeal." Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58, 103 S.Ct. 400, 402, 74 L.Ed.2d 225 (1982) (per curiam). See also United States v. Vicaria, 963 F.2d 1412, 1415 (11th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 596, 121 L.Ed.2d 534 (1992); United States v. Mavrokordatos, 933 F.2d 843, 846 (10th Cir.1991); United States v. Prows, 888 F.2d 100, 101 (11th Cir.1989); Shewchun v. United States, 797 F.2d 941, 942 (11th Cir.1986); United States v. Rogers, 788 F.2d 1472, 1475 (11th Cir.1986). This serves to avoid the confusion and waste of time that would result from dual jurisdiction. Shewchun, 797 F.2d at 943.
 
 
 11
 The district court was divested of jurisdiction over the proceeding once the government filed a timely notice of appeal of the court's order granting Tovar's motion to suppress evidence.
 
 
 12
 Tovar argues that this court lacks jurisdiction to hear the present appeal because Title 18 Sec. 3731 provides that no appeal shall lie when the double jeopardy clause of the United States Constitution prohibits further prosecution. This is a misreading of the statute and is without merit. The government's appeal from the order of the district court suppressing the evidence was made before Tovar was put in jeopardy. Moreover, the question of double jeopardy is not before us. It may or may not ever be raised. As the government acknowledges in its brief, since the government was unable to introduce evidence previously suppressed as to Tovar, it is not surprising that the district court granted a judgment of acquittal at the end of the government's case in chief. We have now decided (Part 2) that the evidence was properly suppressed. In these circumstances, the government may decide not to proceed with another trial of Tovar without this crucial evidence. If this is the case, there will be no double jeopardy question. If the government decides to proceed with another trial of Tovar, she may raise the double jeopardy issue which would then be ripe for decision. We cannot speculate what further proceedings, if any, will take place.
 
 
 13
 On this appeal, there is no case or controversy with respect to double jeopardy and we, therefore, have no jurisdiction to consider such an issue.
 
 
 14
 We reverse the district court's directed judgment of acquittal of Tovar.
 
 Part 2
 
 15
 The district court approved the magistrate judge's conclusion that the agents' entry and search of unit 901 was not authorized by exigent circumstances and that Tovar's consent to search was involuntary.
 
 
 16
 The evidence adduced at the suppression hearing was, for the most part, undisputed. On July 30, 1990, agents of the DEA office and the Coral Gables Police Department, and agents from two other agencies conducted surveillance of two persons later identified as Johnny Lozano (Lozano) and Figueroa who had just obtained one hundred kilograms of cocaine from undercover DEA agents. In all, approximately twelve to sixteen agents from four agencies were involved. The agents followed Lozano from the turnpike between Okeechobee Road and State Route 836 to the Plaza condominium off 49th Street and 18th Court in Miami where Lozano met with Figueroa. Lozano and Figueroa went to the main entrance and one of the men used the security telephone to obtain entry into the building. Neither Lozano nor Figueroa was carrying anything when the two of them entered the building. Agent Curtis watched Lozano and Figueroa through the glass doors. Lozano and Figueroa split up. Figueroa went to the north side of the building on the inside and Lozano went around to the south side on the inside.
 
 
 17
 Shortly thereafter, agent Curtis and another detective entered the building by using the security telephone. Curtis spoke with a building employee immediately upon entering the building. Curtis told the woman that he was looking for a man and described the distinctive colored shirt that Lozano was wearing. The woman said that "they" had inquired about the residence of Tovar, unit 901.
 
 
 18
 Curtis immediately took the elevator to the 9th floor, which was empty. Curtis located unit 901 at the east end of the hallway. He went to the other end of the hallway, established a position at the end of the building and waited. There were units on both sides of the hallway with an elevator in the center. Curtis was peeping around the corner from the exit where the stairwells were located and was hiding behind a wall.
 
 
 19
 Curtis was approximately 250 feet from apartment 901 and had an unobstructed view. Curtis saw Figueroa and Lozano leave unit 901, get on the elevator and go down together. Neither Figueroa nor Lozano was carrying anything.
 
 
 20
 Curtis maintained his position. Approximately ten minutes later Figueroa and Lozano came up in the elevator and proceeded to unit 901. They knocked on the door and someone opened the door to permit Lozano and Figueroa to enter. Curtis could tell that Lozano and Figueroa did not have a key to that unit. Lozano and Figueroa stayed inside unit 901 for five to ten minutes and then left accompanied by a third individual who pulled the door shut, but Curtis could not identify the third person at that time. Curtis heard voices speaking Spanish, but could not distinguish the voices, nor does he speak Spanish. Curtis was also unable to determine the gender of the voices. The three people went to the elevator and proceeded down.
 
 
 21
 Curtis waited approximately ten minutes and then decided to go downstairs to see what was happening. He arrived downstairs in time to discover that the other agents were watching Lozano and Figueroa meet in the area of the Ford which was parked at the southwest corner of the building. Lozano got into the Ford and drove to the back entrance to the building, which is the south side of the building. Lozano backed in toward the glass doors at the rear of the building.
 
 
 22
 The other car, a white BMW was parked in an adjoining lot belonging to another apartment or office building. The Ford Lozano was driving contained the hundred kilograms of cocaine which DEA had placed in the trunk. Lozano got out of the Ford and met Figueroa. Figueroa opened the security door and Lozano took approximately thirtysix kilograms of cocaine from the Ford's trunk. Lozano entered the building from the back carrying the package of cocaine. Curtis watched Lozano enter the elevator, but Figueroa was not within Curtis' field of vision.
 
 
 23
 Curtis knocked on the glass door and an elderly gentleman admitted him approximately ten seconds after Lozano had entered. Curtis ran up nine flights of stairs located at the east end of the building, where he resumed his original position. The ninth floor hallway was clear. About thirty seconds after Curtis resumed his position, Figueroa exited unit 901 and went down in the elevator alone. No other agents were with Curtis at this time. Curtis believed that Lozano was still in unit 901 and he planned to remain in his location until Lozano left.
 
 
 24
 Shortly after Figueroa left, the agents started coming up the stairs from the first floor. The agents asked Curtis where unit 901 was located and then proceeded to that unit and entered.
 
 
 25
 Curtis described the inside of the apartment as containing a large window in the living room facing the south parking lot where the Ford was parked. He said that it would have been possible to look out the window and see the parking lot. After the arrests were made, agency cars were parked around the Ford vehicle, but they were unmarked and neatly parked in slots as if they were tenants. There were no marked units inside the complex itself. A non-involved citizen had called the Hialeah Police Department and it responded with a pretty good force. The marked cars were outside the complex parameter with their lights off. People were on the balconies looking through their windows and could have been seen by anybody looking out the window of apartment 901.
 
 
 26
 After the arrest signal was given, agents converged on the Ford and the buildings. Agents on the first and ninth floors were making arrests, while other agents were securing the Ford which contained the cocaine. There was a substantial amount of activity going on inside the building; Curtis running up the stairs, agents in the elevators, arrests in the lobby. These activities attracted the attention of other residents.
 
 
 27
 Curtis testified that the agents had not tried to obtain a warrant because there were so many apartments in the complex and at that particular time, "I think we were more concerned with not losing it to another party." When the court asked whether Curtis had any reason to think that the cocaine would be destroyed, he answered, "We didn't know. We didn't know who else was inside the apartment. We didn't know at that point in time, definitely that it was in that apartment. We just knew that it was missing and that there were unaccounted for individuals and that 901 was the only apartment that was being utilized."
 
 
 28
 The magistrate judge found that the motion to suppress should be granted because there were no exigent circumstances allowing for the security sweep of the apartment, and Tovar did not consent to the search. He found that "the mere possibility the officers might have been observed from an apartment window is simply too remote to indicate possible destruction of the cocaine." The magistrate judge also noted that Curtis testified that Lozano did not give any indication that he knew he was being followed to the apartment and that there was only one entrance to the apartment which could have been secured pending a warrant. "No other evidence indicates the imminent destruction, removal or concealment of the contraband."
 
 
 29
 Rulings on motions to suppress evidence involve mixed questions of fact and law. We therefore review the district court's factual findings for clear error and its application of the law to those facts de novo. United States v. Ramos, 12 F.3d 1019, 1022 (11th Cir.1994); United States v. Diaz-Lizaraza, 981 F.2d 1216, 1220 (11th Cir.1993). When considering a ruling on a motion to suppress, all facts are construed in the light most favorable to the prevailing party below. United States v. Behety, 32 F.3d 503, 510 (11th Cir.1994); U.S. v. Magluta, 44 F.3d 1530, 1536 (11th Cir.1995).
 
 
 30
 A warrantless entry of a person's home is presumptively unreasonable. Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). However, warrantless searches and seizures of evidence in residences are permitted when both probable cause and exigent circumstances exist. United States v. Burgos, 720 F.2d 1520, 1525 (11th Cir.1983). The government has the burden of proof of showing exigent circumstances. Coolidge v. New Hampshire, 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971). In this case the government established probable cause and focuses on the removal and destruction of narcotics as the exigent circumstance.
 
 
 31
 While there was considerable activity by the agents in and around the building prior to their entry into unit 901, the district court found that there was insufficient evidence to establish that anyone in the unit was aware of it and would therefore possibly destroy the cocaine. It appears that the surveillance agents took great pains, and were successful, in concealing their presence from anyone in unit 901. Generally, exigent circumstances do not exist where the suspects are unaware of police activity. United States v. Tobin, 923 F.2d 1506, 1511 (11th Cir.) (en banc) cert. denied, 502 U.S. 907, 112 S.Ct. 299, 116 L.Ed.2d 243 (1991).
 
 
 32
 The government points to United States v. Socey, 846 F.2d 1439 (D.C.Cir.), cert. denied, 488 U.S. 858, 109 S.Ct. 152, 102 L.Ed.2d 123 (1988), as being similar to this case. There, the court denied a motion to suppress evidence because the suspects could have been aware of police activity that occurred for an extended period of time. While we agree that the facts in Socey supported the conclusion that the occupants would have become aware of the police presence outside, the facts in this case are remarkably different. The underlying question is whether an experienced police officer would reasonably believe that those inside the house are likely to be alarmed and destroy evidence. The test is necessarily objective, and the determination of exigent circumstances will vary from case to case, depending upon the "inherent necessities of the situation at the time." Id. at 1445, citing United States v. Rubin, 474 F.2d 262, 268 (3rd Cir.1973).
 
 
 33
 Our de novo review of the record convinces us that the agents did not reasonably believe that they were confronted with an emergency in which the delay necessary to obtain a warrant under the circumstances threatened the destruction of evidence. We find no error in the district court's application of the law to the facts.
 
 
 34
 We next consider whether there was an illegal entry and whether Tovar's consent to search was voluntary. The district court rejected the government's argument that Tovar had voluntarily consented to the agents' entry and further found that Tovar's subsequent oral and written consent to search was not free and voluntary. Tovar did not testify and the credibility of the government's witnesses was not attacked. Thus, the trial court was compelled to rely only on the uncontradicted testimony of the government's witnesses. Therefore, we review the district court's findings de novo to determine whether Tovar's consent was voluntary. United States v. Garcia, 890 F.2d 355, 358 (11th Cir.1989). The voluntariness of the consent must be judged in the light of the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047-48, 36 L.Ed.2d 854 (1973). "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." Garcia, F.2d at 360.
 
 
 35
 The circumstances of the entry to Tovar's apartment are summed up by the magistrate judge as follows: "Defendant was first confronted by police officers that day when at least five officers knocked loudly at her door, announced their identity as police officers through the closed door, and requested permission to enter. Defendant then opened the door and the officers entered quickly with guns drawn to do the protective sweep." He concluded that under these circumstances, the defendant did not have any understanding of her right to refuse entry and demand a warrant.
 
 
 36
 A protective sweep was conducted while Tovar was seated at the dining room table. She appeared to be calm. The officers entered each room. After this was completed, Pagliery asked Tovar for permission to again search the entire apartment because he thought that nothing had been found and no other people were in the apartment. Pagliery told Tovar that she did not have to permit the further search, but if she did not, the agents would come back with a search warrant. Tovar told the agents that she had just recently arrived and that she did not know what was going on. She agreed to the search and signed a written consent form. The magistrate judge found the consent involuntary. He opined that Tovar had already observed officers explore every room in the apartment and could not reasonably have known that she could still refuse a search. We agree. We entertain no doubt that Tovar opened the door in response to a "show of official authority" and cannot be deemed to have consented to the agents' entry or to have voluntarily consented to the search. Cf. Bumper v. North Carolina, 391 U.S. 543, 549, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968); United States v. Edmondson, 791 F.2d 1512, 1515 (11th Cir.1986). "[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." Florida v. Royer, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983).
 
 
 37
 After a careful review of the uncontradicted facts established in the record, we conclude that the condition which existed at the time made the entry illegal and support the district court's finding that the consent to search was not voluntary.
 
 Part 3
 
 38
 The government contends that the district court was divested of jurisdiction to try codefendants Romeo and Figueroa because of the pendency of its appeal from the order granting Tovar's motion to suppress. Our review of this issue is plenary. Mars, 895 F.2d at 1351.
 
 
 39
 The government candidly admits that when the notice of appeal of the district court's order suppressing evidence was filed, the government intended that the appeal would only involve Tovar. Consequently, the notice of appeal and certification of materiality only referred to Tovar and no defense counsel other than Tovar was served with the notice of appeal. Nevertheless, the government contends that when the district court refused to sever the trial of Tovar from the trial of Romeo and Figueroa, the case against all of the defendants became "one proceeding" for the purposes of 18 U.S.C. Sec. 3731. We disagree.
 
 
 40
 If, as the government concedes, its appeal only involved Tovar, the subsequent denial of a severance of the trial of the codefendants by the district court cannot ipso facto subsume the codefendants as appellees under the guise of "one proceeding." The government cites no authority for its suggestion of such a theory, nor can we find any. The government's argument that this appeal should be viewed the same as interlocutory appeals under the Speedy Trial Act, is unpersuasive. The explicit language of Sec. 3731 leaves no room to expand its meaning. The purpose of each statute is entirely different. They do not lend themselves to such parallel reasoning. The district court was not divested of jurisdiction to try Romeo and Figueroa.
 
 Part 4
 
 41
 The government appeals Figueroa's sealed jury verdict. Figueroa continues to be a fugitive. There is no final judgment or sentence entered in the district court.
 
 
 42
 In a criminal case, a judgment of conviction and sentence is necessary to create a final order which is appealable under 28 U.S.C. Sec. 1291. See Berman v. United States, 302 U.S. 211, 214, 58 S.Ct. 164, 166, 82 L.Ed. 204 (1937); United States v. Wilkinson, 601 F.2d 791, 794 (5th Cir.1979); United States v. Bendicks, 439 F.2d 1120, 1121 (5th Cir.1971). Notwithstanding this, the government argues that even if its precautionary notice of appeal of the sealed jury verdict was premature, and even though no separate certificate of good faith and notice of materiality was filed as to Figueroa, this court has jurisdiction to entertain the government's appeal of Figueroa by virtue of the government's interlocutory appeal of the district court's order suppressing evidence as to Tovar. Not only is this argument specious, but it is foreclosed by what we have said in Part 3 and need not be iterated here. This court has no jurisdiction to entertain the government's appeal as to Figueroa.
 
 CONCLUSION
 
 43
 We affirm the order of the district court granting Tovar's motion to suppress evidence. We reverse the directed judgment of acquittal of Tovar because of lack of jurisdiction of the district court. We affirm the judgment of acquittal of Romeo. We dismiss the government's appeal of Figueroa for lack of jurisdiction.
 
 
 44
 AFFIRMED in part; REVERSED in part, DISMISSED in part, and REMANDED for further proceedings consistent with this opinion.